If there are any high school students who are able to stay, then please feel free to remain afterwards. Law students. Law students, sorry. We sometimes have high school students. Judge Jordan's wife has brought her students in the past. Students of any variety are welcome to remain. And with that, we have our next case, which is Jennings v. J.W. Cheatham, LLC. Mr. Prater. Good morning, and may it please the court. The district court opened its order by saying, quote, this is a case about a fight. That's an incorrect summation of what happened here and reflects from the opening line, the incorrect analysis applied by the district court. It viewed this case through the lens of McDonnell Douglas at the expense of Rule 56. The question before this court is whether Rule 56 permitted the district court to adopt J.W. Cheatham's versions of events, resolve credibility and ferential and genuine factual disputes against Mr. Jennings such that it could take this case away from a jury. Rule 56 did not permit that result. In reviewing this case de novo and drawing all evidence and reasonable inferences in favor of Mr. Jennings, summary judgment should be reversed. I have a question about the retaliation claim. Because as you know, our law, our case law does speak up temporal proximity. And here you have arguably two, not arguably, I think you have two complaints that were made before his termination and then a comment made after his termination. And several months passed in between those complaints and then of course his termination. So can you tell me how do you get to a causal connection there? Yes, Your Honor. So not only did Mr. Jennings engage in protected activity through his initial complaint in April or May, depending on which version of events you credit there, also with his wife's call, but also through his subsequent complaint to Superintendent Brooker. And then also we believe that his objection on his last full day of working, where he objected to Mr. Seymour's use of the racial slurs directed at him multiple times, constitutes protected activity as well. As subsequently, whenever he is being terminated over the phone, he points out to Mr. Dameron, the owner, HR director and EEO officer of JW, that he is being fired for quote, being called a dumb N word. So there's multiple protected activities. If he's already being fired, then how could he be fired in retaliation for his reaction to the firing? Understood with respect to the final statement on the phone call, Your Honor. The original two plus the objection to Mr. Seymour are really the basis for the protected activity at issue there. But also, I think it could be found that during that discussion with Mr. Dameron, that the decision to still ultimately fire him after hearing that objection could be considered protected activity. Nevertheless, there's no... You have to not only have protected activity, but you have to have retaliation for that protected activity. And so I think if the decision to fire him had already been made, then I don't think you can fairly say that that was in retaliation for his statements, right? We understand and agree that that likely is the result with respect to that particular instance of him raising an issue or complaining about that conduct. However, unlike in some other cases where it's in poor proximity as an issue, there's no other intervening issues here, like a bad performance review or something like that. This is Mr. Jennings, who is from basically the beginning of his employment with JW Cheatham as a concrete layer, being discriminated against by his direct superiors, both of his foremen, explicitly referring to him by racial epithets and otherwise just making horrible discriminatory statements to him on a nearly daily basis. And his reputation as a complainer is something that absolutely could be determined by a reasonable jury to have influenced the adverse action that he suffered after that final time of him objecting to Mr. Seymour's use of the slurs that day to Mr. Seymour directly, which was... He was fired, if I understand it, presumably for, and again, I agree with you in terms of perhaps the characterization of this case only being about a fight, but he was fired for being in a fight as opposed to, at least that's what's on the record, as opposed to the complaints that he made previous months before. Well, there's a couple of issues with that, Your Honor. First of all, there wasn't actually a fight. There was no physical contact that happened other than Mr. Jennings' tools being thrown by Mr. Seymour. That's the only physical aspects of it. So there wasn't even a fight. This was an argument, a heated argument nevertheless, but that's that. Now, also, Mr. Jennings does not have an obligation to come up here and establish pretext. It's not an element of his claims. It is not something that he is required to do to survive summary judgment, let alone prevail at trial. So just because they said he was involved in this fight, that doesn't carry the debt, particularly where on a record like this, there are just so many credibility issues and inconsistencies with JW's story from the false information that Mr. Dameron wrote in his allegedly contemporary investigative report to the statements, including the written statements were typed up by him and obtained by Mr. Rose and Mr. Excellent, but also what Mr. Rose told him. Mr. Rose was clear in his deposition testimony. He just said it was a heated argument and they both had bad attitudes and Seymour left. He didn't quote, as Mr. Dameron wrote in the report, say everything that Andre Excellent allegedly told him in a separate meeting. That just didn't happen. The credibility issues here and are substantial and are something that the district court, frankly, should not have weighed in on or even ignored. These are jury issues and jury questions. Can you talk a little bit about the punitive damages and the section 1981 intentional discrimination count? Yes, your honor. So with respect to punitive damages, the district court didn't address that explicitly because it just, it got rid of both claims, but let's assume that that we disagreed. Absolutely. So I think Goldsmith first Bagley is instructive on, on this one where, um, that court held that apathy towards civil rights violations and things like failure to discipline employees for using racial slurs was evidence that supported reckless indifference, sufficient to sustain a punitive damages. And we wouldn't have to send it back to the district court to determine whether or not to apply punitive damages. We could make that decision ourselves. Absolutely. Okay. Absolutely. And then going back, your honors to, um, rule 56, I think it's all, we all very clearly understand McDonnell Douglas is not the only game in town. Convincing mosaic applies. And as long as there is enough evidence to, for a reasonable jury to infer intentional discrimination, you must survive summary judgment. That case survives. And this case is exactly that. If it's not, I frankly don't know what is, um, so this case to me, at least as a good exemplar for why McDonnell Douglas can't be the only game in town. Um, but I don't think the Supreme court ever said it was. Um, but that's why for me, I want to, I want to make sure I understand your retaliation argument, which is the complaint in may of 2021, the complaint in August of 2021, and the contemporaneous objection to the termination decision in January, 2022. Right. Yes. So we've, we've already discussed a third one and your, your retaliation argument is that his firing was for related to his complaints in may of 2021 and August of 2021. Yes. Your honor. Okay. I think it's each time he complained and, and frankly, he complained, uh, by telling Mr. Props to his other four men at times to not use these words. Um, and in another incident involving another employee where Mr. Props said things like, I don't say the N word. I say, I tell inward jokes. I mean, these are things that right. Which is anyway. Um, I'm so sorry. No, I'm, I'm, I'm agreeing with you. Um, it's yes. This record is, I guess I'm struggling because it does seem that our case law has created an equation that you have a complaint, you have proximity of time, and then you have an adverse action equals retaliation. And I'm just still not clear. I understand the complaint, but you don't have the time in your favor. And then you have a termination that again, is far from the last complaint, formal complaint given. And that is a result of a, of an argument as you say. So I just, and it's not to say you haven't created a convincing mosaic of a discriminatory racially discriminatory environment, but that's a separate claim from the retaliation. So what is your best argument for why we should still find that your retaliation claim survives? Yes, Your Honor. Yeah, I believe it's, I believe it's the Jenkins case actually, where, and, and even, um, in the, um, there, there is other case law cited. I apologize. The specific name escapes me at this moment. However, but where, while the temporal proximity may cause issues with respect to being considered direct evidence, it can still be considered circumstantial evidence of a discriminatory act, including retaliation. So the temporal proximity here, this is a, in the scheme of things, a relatively compressed situation. Um, and again, it's an ongoing situation involving just a handful of people. It's a closely held companies, small people, or small group of people involved. Um, and again, Mr. Jennings had a reputation at this point with the ultimate decision maker of he's a complainer. He's complaining about, there are only two foremen on the concrete crews, Mr. Propst, who he complained about within months of joining and Mr. Seymour, who he had his dispute with at the very end. These are two longstanding employees, at least Mr. Seymour, 15 plus years there. And, and JW as it seems decided they wanted to support its longstanding white employees and get rid of the guy who was complaining. So they falsified the investigative records, papered it up so that they could fire the complaining black employee and did so. I think the problem you face is that we've said in Thomas versus Cooper lighting, for instance, a three to four month disparity between the statutory, statutorily protected expression and the adverse employment action is not enough. And then in Jefferson, we said it needs to be within days or at the most within two weeks of protective activity. So we wouldn't we have to overrule those cases to find for your client here? I don't think so, your honor. And I think that goes back to the objection that he made to his direct superior, Mr. Seymour, in the moment of Mr. Seymour using these slurs against him on the, on the job site, that is somebody who everybody testified when there's discrimination, that is, it sounds like almost what you're suggesting is that we would almost look like a totality of the circumstances that eat, that we, we don't look at them separately. We look at these complaints that he made, he made within days, but then there was the three months and then the five month one. And so then you say like, I'm was going to make a third one, but then they fired me. So you have to look at all of them. I think we do have to look at the totality of the circumstances here on the, on the record and that he actually did make the third one whenever he objected to Seymour and that was reported to the decision maker. Right. But, but I guess the, the issue is that we do have these existing cases that suggest that you need to have this temporal proximity. And so, um, I understand your argument, but it's sort of, I'm not sure if we can distinguish those cases without an en banc. Understood your honor. And we would be happy to address that more on point in any supplemental briefing or subsequent hearing. All right. Thank you. You've reserved your time for rebuttal and now we'll hear from Ms. Scarponi, Scarpone, Scarpone. Thank you. Your honors may please the court. Kayla Scarpone on behalf of appellant JW Cheetham who we refer to as JWC for short. Um, JWC is asking this court to affirm the district court's decision because the totality of the circumstances, even when you take all factual disputes weighed in favor of the plaintiff's position and the position and the plaintiff's conflicting testimony, um, there's still insufficient evidence to raise the inference of either discriminatory intent or retaliatory intent. How can we, how can we disregard the allegations with regards to the intentional discrimination? Well, specifically the, the convincing mosaic has to raise the reasonable inference that there is a discriminatory or retaliatory intent on the part of the decision maker. Let's set aside retaliatory just for, for, I think we can focus on, based on the questions, we can likely focus on the, um, the intentional discriminatory action, right? Not retaliation. How, I don't honestly see how this doesn't get to a jury on these facts. So the plaintiff has to tie the discriminatory intent to Mr. Dameron, the decision maker himself. So this case is not a question about whether there were, um, you know, alleged flagrant comments made by other Mr. Dameron, what was reported to him, what he believed happened and why he made his termination decision. I believe even... Well, you have steps before that, right? I mean, he's the HR person, so he's supposed to do investigation. He's supposed to interview people, um, have written reports. There's a lot of that is missing. Yes, Your Honor. I'd like to, um, kind of address that in the, especially with the, I guess, sequence of events that's here. And I know, um, you were talking about temporal proximity related to retaliation, but I think it, it bears consideration and mentioning of the full timeline and the discrimination, um, claim as well for the totality of the circumstances or convincing mosaic. And I think the plaintiff wants to kind of compress the timeline here and, and make this seem like it was a, you know, ongoing flagrant discriminatory environment for the plaintiff when really these things are stretched out and they involve, um, you know, months in between incidents and two separate investigations, two separate crews. So you have the plaintiff's first, um, complaint. Has anyone ever disciplined for these, um, incidents besides your opponent on the other side? No, Your Honor. I also like to address that with, you know, part of the outcome of the investigation. But that's, but your client, well, as you say, the decision maker, um, you know, didn't do anything, didn't move Mr. Jennings to a new crew after the first incident. I'm not even talking about the second incident, the first incident. So he investigated, he knew what happened. He knew that, um, racial epithets were used. Um, he said he would speak to the foreman and then no one gets disciplined. Your Honor, we, we have to look at the investigation as well. So to that first incident, plaintiff testifies that he, is anything I said wrong? Is that not what the decision maker found that he investigated? And he told Mr. Jennings that he would speak to Mr. Probst. He spoke to Mr. Jennings on Jennings version of events. Jennings said that the foreman had called him a few names, including the N word. He asked that the, he asked that the foreman get talked to. That is what he wanted at that point. Mr. Dameron said Mr. Dameron does an investigation at that point. He brings in the supervisor, the superintendent Brooker, who says there's, he doesn't know of anything. He brings in foreman Pross. He brings in separately another minority member of the crew, Ray Osegera, and he can't corroborate that those things are his affidavit said that he didn't interview Jennings before determining that Jennings was at fault and deciding to fire him. How, how is that remotely an appropriate way to if discrimination is not involved? Right. So again, so that's to the second incident, which is before his termination, not this first incident. Um, Mr. Dameron and the, the testimony is undisputed that Mr. Dameron interviewed the other employees and had substantially corroborating, um, versions of events that corroborated the version of events that Wayne Seymour came in and told him when he was shaking through his keys on the counter and That was that plaintiff started the fight. He got in his face. Plaintiff called Mr. Seymour a racial slur. Mr. Seymour said back, I'm not that racial slur. And then plaintiff again, went at him to get into his face and Andre excellent. Another black employee had to kind of pull them apart. Andre excellent is interviewed after that and gives the same version of events and also pipes up and says, Mr. Seymour didn't do anything wrong here. Plaintiff did plaintiff is using the N word and I'm not going to stand by and watch someone get disciplined for something they didn't do. And then you have Mr. Rose as well, which Mr. Dameron testified, told him basically the same thing. And then in Mr. Rose's testimony, Mr. Rose doesn't really give a materially different version of events about what he witnessed that that day. So the question is, what did Mr. Dameron know? Mr. Dameron also says after hearing those corroborated versions of events, you know, I've determined that plaintiff corroborated except from Mr. Jenny. Correct, Your Honor. And he's there any statement or explanation in the record why Mr. Dameron decided not to interview the very person that he ultimately fired? Yes, Your Honor. Both in the incident report and Mr. Dameron's testimony, he testified that with three, three other witnesses corroborating the story, he found it to be a closed case. He was also worried about the situation getting inflamed even more or plaintiff kind of going back against the other employees that told him, you know, kind of told on him. So now that's the reason why I know we're talking about discriminatory intent. I don't want to blur the issues, but now you're moving in the direction of the retaliatory behavior. If indeed you're saying Mr. Dameron's motivation is that he didn't want to get into it with Mr. Jennings. He didn't want to further inflame the situation, a situation where Mr. Jennings is saying I'm being repeatedly called the n-word and other racial slurs. So the answer is to fire the complainant? I'd like to address that too because I believe plaintiff argued that, you know, there's an inference or plaintiff had a reputation of being a complainer at that point. There's no other evidence or statements in the record from Mr. Dameron or otherwise that plaintiff was deemed in his mind this complainer. The evidence in the corroborated accounts, yes, he decided not to interview Jennings, but the case law doesn't require a perfect investigation. The case law requires that there's a different reason than a discriminatory or retaliatory animus for the decision. On this record there was. I see very little evidence of the district court engaging with the case law at all, frankly. I mean there 1997 and I believe the last decision that the district court cited was from 1997. You know, even then I'm not sure that this doesn't qualify, but I mean engaging with the case law I saw no discussion of anything except vague references to comparators and it didn't even say McDonnell Douglas, much less Tynes or any of our more recent cases. How do you respond to that? Um, so I believe the court looked at every piece of evidence that the plaintiff has raised as part of its convincing mosaic and made the right conclusion. If this court, you know, disagrees and thinks that the court focused too heavily on McDonnell Davis points or focused too heavily in calling it the decision pretext, you can review this de novo on the record and still come to the conclusion that the convincing mosaic or totality of the evidence does not rise. There's not enough. Let's let's do that. Let's look at the record. So for the first incident, Jennings was assigned to a concrete crew with props who's white, right? And his direct supervisor Booker was also white, right? Yes, your honor. Jennings was the only black man on the crew and everyone else was Hispanic, right? That may there may be other white but white and Hispanic, I believe. Not another black employee. That's correct. Okay. And then props started calling him boy or black instead of his name, right? That's what plaintiff has alleged. Right. And according to Jennings props also said, black lives don't matter. And he can wash my black off. You can't wash your black off. Right? Yes, your honor. A black man shouldn't be president. And I'm not going to say the rest of it. I mean, the N word is in there. Just the horrible, horrible things just to be told at work. And that I mean, that's the first incident that wasn't the only incident. And then Jennings is the one who gets fired. I mean, I don't I don't see how if those things are true, which for purposes of this stage of the case, we have to accept. I don't I don't see how you could find that there is no discriminatory intent if those things if those facts are true. So those facts may be true. But again, you have to look at what the evidence shows that Dameron knew. Right. But Dameron didn't even bother to interview Jennings at the second incident. At the first in this incident, he did interview him. He told him to come back, which Jennings Jennings. But again, the company had no interest in a truthful and full investigation, because you can't conduct an investigation without talking to the person who is the victim. I mean, I don't even understand under what theory the company thinks that that's a full and a fulsome investigation. Again, Mr. Dameron's testimony was that it was corroborated by three employees. He didn't he didn't even know what Jennings his complaint was, because he didn't bother to interview him. And for the first for the first one, Jennings told Dameron that props have been calling him racist names, including the N word, and that he had been reluctant to tell management because he didn't want any problems. Your Honor, I don't think he I think he testified. That's why he didn't say it sooner. He didn't tell Dameron that. But again, Dameron, he did tell Dameron that he had been called racist names, right? Yes. And Dameron told him he would talk to him. He investigated by talking to other employees, couldn't corroborate it, told plaintiff to come back and tell him if comments continued, which plaintiff undisputedly did not do, even though he now allegedly says that they continued and got worse. So the door was left open there. Plaintiff is the one that did not come back. When plaintiff does make another complaint three months later, he is moved to the other crew. Then he goes on for four months, I believe, on his timeline without anything happening. So it's not this continuing barrage of inflammatory issues. And again, I agree with your honors, what the plaintiff has alleged happened on that first crew is blatant. It is inflammatory. But again, we have to look at what the decision maker knew and the actions taken while someone might say they're not perfect. The actions taken were not perfect. And again, this is speaking for someone who actually conducted investigations on employment matters. Well, the testimony is there was still an honest belief that plaintiff was at issue in that last incident. Now, your honors, I'll put it to you this way. Again, plaintiff has testified after he got terminated that he, you know, he said, I'm getting terminated for being called a, you know, you know what? Now, I believe there was testimony and information and what Dameron had from those three employees that plaintiff first called Seymour the N-word. Seymour said, I'm not the N-word. Plaintiff then might have been yelling back that plaintiff was calling him the N-word. So Mr. Dameron did have that information. If plaintiff, you know. Well, he also had, I think Rose testified that he never, that they were never separated. Rose testifies, I didn't actually hear Seymour say the N-word. So if anything, it's still not clear. Even with the folks that Dameron investigated, there's no clear narrative as to what happened. And then you don't have Jennings' side of the story either, just him being fired. I believe there is a clear statement between Seymour and Andre Excellent, who's the other black employee, which I'll bring up. The plaintiff wants to kind of draw an inference about the fact that signed statements were not done and therefore there's an incomplete, you know, incomplete documentation. Well, that Dameron said he had statements, but then he actually didn't. And I think that's an important. Correct. But I'd also put in there. Why would you say that you had signed statements if you didn't have them? I believe they weren't completed. So again, incomplete documentation of the investigation. However, Andre Excellent is the other black employee on this crew. His version of events is completely undisputed. The only version of it is the one in the incident report. It exactly matches up with Seymour's and it puts the blame on the plaintiff. Right. But what what let's let's say that that would be sufficient to survive liability. You're asking us to say, well, we've looked at the record and we think it didn't happen the way Jennings says that it happened. And isn't that the jury's job, not the judge's job? I'm not asking you to do that. I'm asking you to say we've looked at the record and it shows that Dameron believed it happened the way that it was reported to him. That plaintiff was at fault for the fight. That was a legitimate reason for termination. And there's no other bits and pieces that give rise to push that inference of discriminatory or retaliatory intent over the edge and make this a jury issue. Problem is that Dameron's credibility is in question, if nothing, for no other reason than the fabrication perhaps of having these written reports in existence. And you just use the word incomplete. My understanding is they were non-existent. They were not done. And my argument is that that is evidence or an inference of an incomplete investigation. And my argument is that it's speculation that those those witness statements, if they had been done, would say something different or back up plaintiff's version. And then you have the other jump that the missing witness statements also give rise to the fact and tie back to Dameron that his intent was the the but for cause of the termination was discriminatory or retaliatory intent. We have to look at the facts in the light most favorable to the non-moving party. And even there, I think you would have a say that the law is that the the plaintiff can allege that he was from day one targeted with racial slurs and poor treatment. Nothing was done about it. And then that process continued. And then finally, there was a fight and he got fired, whereas the other person in the fight who he alleged had been targeting him with all these unconscionable slurs wasn't fired. And you would have the rule be, well, since the investigation wasn't complete, we think maybe Dameron thought that he was at fault for the fight. And so he fired him because you can't have a fight at work. Is that what you're asking us to hold? No, I I'm asking you to again, this is not a hostile work environment case. It ties back to what Dameron knew. I don't believe Dameron knew about the extent of what is alleged to have gone in that first place. I don't believe Dameron knew that plaintiff on the second time was allegedly called slurs. And again, there was only one incident with that subsequent foreman. It has to be tied back to Dameron and his intent. And the court has repeatedly said we don't sit as a super personnel board and, you know, dictate the business decisions, the the level of an investigation. Do you think there's a way to get past summary judgment other than the company confessing that they fired the person for racially discriminatory reasons? No, your honor. I believe there can be obviously a convincing mosaic of circumstantial evidence. But if you compare this case to some of the other, I suppose, other cases that where the court has found there could be a convincing mosaic, there's a lot of other things. There's the suspicious timing. I'd bring up the and I'm sorry I'm over my time, but I'd like to answer your question. I'd bring up the Ishmael case, which was recently decided, obviously, after the briefing in our case was completed. The court sent that one back saying, you know, the court needs to reevaluate this. There could be enough. There's there was a very short again, that was retaliation case. But there was I think we've got a retaliation. So I'll let you complete. It's still a convincing mosaic case, though, but short time frame statements by the decision maker. That would be discriminatory. Thank you. Mr. Prater, you've reserved three minutes. Thank you, your honors. I will briefly address this a few points that came up during counsel's argument. First, I'll go to Judge Arbuto's comment that the failure to interview and talk with Mr. Jennings after this incident where Mr. Seymour is allegedly so distraught that he's almost crying and Mr. Dameron's office just it makes no sense. The credibility issues here, again, just stack up, stack up, stack up. And these things were the district court actually made ultimate decisions regarding it. Even the fact that he called it a fight was a credibility determination and a disputed factual issue that was decided by the district court. None of that should have happened. Summary judgment is improper where those things exist. Didn't Seymour admit to Dameron that he'd use the N-word during that conflict? He does, indeed. And Dameron even wrote that in the obviously disputed investigative report. And so he knows that it was out there. And then Dameron was asked explicitly, was Mr. Seymour even coached to not use that word? He said no. There was absolutely no discipline in connection with any sort of use. Normally, normally when you have an investigation like this, okay, assuming the first investigation, let's just get to the, there was nothing that happened after the first one. Normally you then have something where you have remedial training and you have the employees come in and you give them a workshop and say, you don't, I mean, I don't know why you would need to tell this, but you don't do these things, okay? But you do. You have a remedial workshop where you say, this is what happens and you can't do this. And if you do this, you will be terminated. That was not done here, correct? Not at all. Not at all. And in fact, even after the first complaint where Mr. Jennings and his wife both called in to JW and spoke to Mr. Dameron directly talking about racial slurs that were used, well, counsel argues that the door was left open for Mr. Jennings to come back. Why would anyone do that when the only thing that happened after his complaints was the situation got worse? The slurs continued. His working environment on a day-to-day got worse to the point where he was physically threatened by another employee with a bowl float, a big metal stick, who, where that employee had called him a racial slur that day. And then the foreman started doing it too. It just, the situation that happened here is at a minimum for summary judgment purposes, convincing mosaic that a reasonable jury could conclude intentional discrimination can be inferred from. I would also like to just touch the Andre Exelon account that's referenced in the investigative report. Again, back on the credibility issues, that report itself is not something that the district court, given the record here, should have been able to make decisions based on. The entire thing is in question, given multiple disputed aspects of it that there's no explanation for. So regardless of what he wrote, Andre Exelon said, that's not something that really should be taken into account here. Also, it's interesting to note that Mr. Dameron's account of the first complaint by Mr. Jennings and his wife was that neither one of them said anything about race, but he still decided for some reason, I'm going to move Mr. Jennings to another crew because there's another black guy there that hasn't complained about discrimination in years. Again, the record is replete here. Summary judgment was inappropriate and we respectfully request that this court reverse summary judgment on both counts and remand this case for trial, as well as permitting the punitive damages claims to remain. Thank you. Thank you. Our last case is